**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

SUSAN ANN MYERS,                    :

        **Plaintiff,**          :          **CIVIL ACTION NO. 3:13-0162**

        **v.**                      :                    **(JUDGE MANNION)**

CAROLYN W. COLVIN,[1]            :
Acting Commissioner of
Social Security                         :

        **Defendant**        :

## MEMORANDUM

The record in this action has been reviewed pursuant to 42 U.S.C. §§405(g) to determine whether there is substantial evidence to support the Commissioner's decision denying the plaintiff's claim for Disability Insurance Benefits, ("DIB"), and Supplemental Security Income, ("SSI"), under the Social Security Act, ("Act"). 42 U.S.C. §§401-433, 1381-1383f. Based upon the court's review of the record, the plaintiff's appeal will be granted.

## I.   PROCEDURAL HISTORY

The plaintiff protectively filed applications for DIB and SSI on June 24, 2009. (TR. 112). In the applications, she claimed disability starting on

---

[1]     On February 14, 2013, Carolyn Colvin became Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil procedure, she has been substituted as the defendant.

December 5, 2008, due to spasmodic cervical torticollis[2], also known as cervical dystonia, migraine headaches, and a fractured left ankle. Both applications were initially denied on February 8, 2010, (TR. 10), and the plaintiff requested an administrative hearing. (Id.).

The Administrative Law Judge, ("ALJ"), held a video hearing on April 20, 2011, and took testimony from the plaintiff and Sheryl Bustin, a vocational expert. After the hearing, the ALJ concluded the plaintiff could perform sedentary work activity with restrictions, including jobs such as a table worker (quality control), security system monitor, and bench assembler. (TR. 10-19). The ALJ then concluded the plaintiff was not disabled within the meaning of the Act. (Id.). The Appeals Council denied the plaintiff's request for review, (TR. 1-6), making the ALJ's decision final. See 42 U.S.C. §405(g).

At issue before the court is whether substantial evidence supports the Commissioner's decision that the plaintiff was not disabled because she was

---

[2]     Torticollis is a stiff neck associated with muscle spasm, classically causing lateral flexion contracture of the cervical spine musculature. It may be congenital or acquired. The muscles affected are principally those supplied by the spinal accessory nerve. Taber's Cyclopedic Medical Dictionary at 2117-18 (19th ed.  2001).

    Spasmodic torticollis is torticollis with recurrent but transient contractions of the muscles of the neck and especially of the sternocleidomastoid, which is one of two muscles arising from the sternum and inner part of the clavicle. Taber's Cyclopedic Medical Dictionary at 1967, 2118 (19th ed.  2001). Botulinus toxin, also known as botox, has been used to treat spasmodic torticollis to inhibit the spastic contractions of the affected muscles. Id.

capable of performing sedentary work activity with restrictions.

The plaintiff filed her brief in support of her appeal on March 27, 2012. (Doc. 10)[3]. The defendant filed a brief in opposition on April 30, 2012, (Doc. 12), and plaintiff filed a reply brief on May 9, 2012. (Doc. 13).

## II.   STANDARD OF REVIEW

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552 (1988); Hartranft v. Apfel, 181 F.3d 358, 360. (3d Cir. 1999), Johnson, 529 F.3d at 200. It is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971).

To receive disability benefits, the plaintiff must demonstrate an "inability

---

[3]      The court notes that the plaintiff originally filed this action in the Eastern District of Pennsylvania on November 23, 2011, where the action remained until January 23, 2013, when it was electronically transferred to the Middle District of Pennsylvania. Once it was transferred to the Middle District, the action was assigned to the Honorable James M. Munley. By verbal order of November 20, 2013, the matter was reassigned to the undersigned.

to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §423(d)(2)(A).


## III.   DISABILITY EVALUATION PROCESS

A five-step evaluation process is used to determine if a person is eligible for disability benefits. See 20 C.F.R. §404.1520. See also Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further. See 20 C.F.R. §404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether

4

the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §404.1520.

Here, the ALJ proceeded through each step of the sequential evaluation process and concluded that the plaintiff was not disabled within the meaning of the Act. (TR. 10-19). At step one, the ALJ found that the plaintiff has not engaged in substantial gainful work activity at any time during the period from her alleged onset date of December 5, 2008, through the date of his decision. (TR. 12). At step two, the ALJ concluded that the plaintiff's impairments, including cervical torticollis, status post left ankle fracture and obesity, were severe within the meaning of the Regulations. (TR. 12-14). At step three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in Subpart P, Appendix 1, Regulations No. 4. (20 C.F.R. §404.1520(d), §404.1520(d) and §416.920(d)). (TR. 14). Before considering step four of the process, the ALJ determined the plaintiff's residual functional capacity. In doing so, he determined that the plaintiff could perform sedentary work activity with a sit/stand option and which was not production oriented. (TR. 14-17). At step four, the ALJ found that the plaintiff was unable to perform her past relevant work. (TR. 18). At step five, the ALJ determined that there were jobs that exist in significant numbers in the national economy that the plaintiff could perform. (TR. 18-19). The ALJ therefore concluded that the plaintiff had not

been under a disability, as defined in the Act, at any time from December 5, 2008, the alleged onset date, through the date of his decision. 20 C.F.R. §§404.1520(g) and 216.920(g). (TR. 19).

## IV.   BACKGROUND

The plaintiff was born on August 10, 1965, and was forty-three (43) years old on the alleged onset date of disability, which is defined as a younger individual. (TR. 19, 112). She has a high school education. (TR. 18). Her past relevant work activity includes work as a tooth carder, a teacher's aide and administrative assistant in a daycare center, a mail sorter, and a night baker. (TR. 152).

The medical evidence of record establishes that, in early 2007, while still employed as a tooth carder, the plaintiff began complaining of pain and spasms in her neck, her head tilting to the right, an inability to turn her neck to the right, migraines, and numbness and tingling in her fingers and arms. (TR. 143, 146-47, 315).

The plaintiff indicated that she tried to lessen the neck tilt and pain by attaching weights to her ponytail with a string to pull her head to the left. (TR. 33). In addition, the plaintiff wore a cervical collar at work. (TR. 242). She went to physical therapy in early 2007, but physical therapy aggravated her pain and migraines. (TR. 146, 247). The plaintiff then sought the advice of a chiropractor. (TR. 33, 146).

In early 2008, the plaintiff took a period of short term disability. (TR. 143, 454). When the plaintiff returned to work, she reduced her hours and changed her jobs, but was unable to complete her duties. (TR. 132, 143). The plaintiff stopped working in December of 2008. (TR. 112).

The plaintiff treated with Anthony May, M.D., at Wellspan Neurology in December 2008 for her spasmodic torticollis. Dr. May performed a botox injection and scheduled the plaintiff for a three-month follow-up. (TR. 518-22). The plaintiff has been receiving routine botox injections every three months since 2008 with mixed results. While some injections have been noted to improve the plaintiff's symptoms, others have exacerbated the plaintiff's problems. For example, a botox injection in November 2009 caused the plaintiff's head to drop to her chest, a condition which lasted until January 2010, when the injection wore off. (TR. 194, 357). This condition made it difficult for the plaintiff to lift her head up enough to eat. (Id.).

In October 2009, an MRI was conducted on the plaintiff's cervical spine, which revealed a disk osteophyte complex at C3-C4 with neural foraminal narrowing. (TR. 331-55). No spinal cord compression or abnormal spinal cord signal intensity was noted.

In February 2010, a state agency medical consultant completed a residual functional capacity assessment, which indicated that the plaintiff was limited to lifting and carrying twenty pounds occasionally and ten pounds frequently, standing and walking for six hours in an eight hour work day and

sitting six hours in an eight hour work day. (TR. 39-45). The ALJ gave this assessment limited weight finding that the consultant had not had the opportunity to evaluate the plaintiff and, therefore, had not had the opportunity to observe the functional limitations caused by the plaintiff's impairments.

The plaintiff was seen at the York Hospital Emergency Department on February 11, 2010, after slipping and falling down the stairs. Thereafter, Dr. Alhadeff performed surgery for a left ankle fracture (TR. 331-55).

In March 2010, the plaintiff was seen by her primary care physician, Dr. Wiley. At that time, Dr. Wiley noted that the plaintiff weighed 262 pounds and her BMI was 41.65.

The plaintiff began physical therapy for her ankle fracture in April 2010. The plaintiff presented to Dr. Alhadeff for follow-up in May 2010, at which time it was noted that the plaintiff had appropriate range of motion in her ankle. The plaintiff was discharged from physical therapy in June 2010 with her therapy goals having been partially met.

Also in June 2010, Dr. May noted, at that time, that the plaintiff's spasmodic torticollis was well-controlled. (TR. 430-38).

In September 2010, the plaintiff underwent the removal of the syndesmotic screw from her left ankle. There is no indication in the record of any further follow-up for this condition.

In January 2011, Jessica Haag, D.P.T., performed a consultative examination of the plaintiff. (TR. 514-17). Dr. Haag noted that the plaintiff had

8

a standard hand grip of 30 with her right and 36 with her left, as well as a key pinch of 9 with her right and 8 with her left. The plaintiff demonstrated a score of 77% on the positional tolerance test which correlates with a rating of entry level. The plaintiff had a score of 0% on the upper level reach test and the stooping reach test due to her refusal to complete the test because of pain. Dr. Haag noted that the plaintiff sat with her head positioned in moderate right lateral flexion and left rotation. The plaintiff's gait was noted to be slow. Dr. Haag indicated that the plaintiff was able to perform a narrow based stance with eyes opened for 25 seconds, as well as with eyes closed for 11 seconds. The plaintiff was intact to light touch in her bilateral upper extremities. Dr. Haag opined that the plaintiff would be rated for sedentary work activity; however, she further noted that safety issues associated with the plaintiff's balance during walking and poor body mechanics may play a role in her ability to work.

In February 2011, Maria delosAngeles-Sicilia, M.D., a state agency physician, performed a consultative examination of the plaintiff. (TR. 523-30). The plaintiff was noted to have a history of migraines, as well as cervical dystonia. Dr. Sicilia indicated that the plaintiff was functionally independent in activities of daily living, including bathing and dressing. The plaintiff was noted to be able to cook, do laundry and perform household chores such as washing dishes and grocery shopping.

Upon examination, Dr. Sicilia noted that the plaintiff's range of motion

in her neck and shoulder was limited by pain. No focal tenderness with palpation of the cervicothoracic and lumbar spinuous processes was noted. Dr. Sicilia noted that the plaintiff's gait was slow with loss of balance; however, she indicated that the plaintiff was able to stand on her toes without difficulty for about thirty seconds at a time without loss of position and get up without holding onto a chair. Dr. Sicilia diagnosed the plaintiff with cervical dystonia, as well as a history of migraine headaches and a history of a fractured left ankle. She opined that the plaintiff could perform light duty with restrictions on ambulation.

As part of her assessment, Dr. Sicilia prepared a medical source statement which limited the plaintiff to lifting and carrying twenty pounds occasionally and ten pounds frequently, standing and walking for six hours in an eight hour workday and sitting for six hours in an eight hour workday with the option to alternate siting and standing at will. (TR. 523-30). Dr. Sicilia further indicated that the plaintiff was limited in her ability to push and pull with her upper extremity, and that she was limited to occasionally bending, kneeling, stooping and climbing and was prohibited from balancing. Further, the plaintiff was limited in her ability to be exposed to heights.

At her hearing before the ALJ, the plaintiff testified as to her medical conditions. The plaintiff testified that she has dystonia which causes constant neck pain and a "charlie-horse-like feeling" that radiates to her right shoulder and down to her elbow . (TR. 26, 177-78). She stated that the dystonia keeps

10

her from being able to turn her head to the right and also causes problems with her balance. (TR. 29). She has tingling in her fingers and has difficulty lifting, holding and gripping items. (TR. 177-78). The plaintiff indicated that she has undergone botox injections every three months since 2008 to weaken the overactive muscles that go into spasms. (TR. 34). She testified that surgery was discussed with her physician, but she was told that it is not an option to correct her dystonia because it would risk causing her neck to fall in other directions, such as forward, backward or to the other side. (TR. 34).

The plaintiff testified that she also suffers from migraine headaches two or three times a week, despite being on medication. She testified that she can sometimes get rid of the migraines within the day they begin, but that they sometimes last longer. (TR. 30). In addition to taking medication for her migraines, the plaintiff testified that she has to lie down in a dark, quiet room, ice her head and try to sleep. This usually takes four to five hours.

In addition to her dystonia and migraines, the plaintiff testified that, in February 2010, she broke her left ankle which required a plate and pins to be placed. (TR. 25). As of her hearing, the plaintiff stated that she still suffered from pain and limitation in movement. (Id.).

As a result of her impairments, the plaintiff testified that she has difficulty standing, reaching, and walking; she can only walk for 10 minutes before needing to rest; she has difficulty climbing stairs; and she has difficulty sitting if her head is not propped up with a pillow. The plaintiff testified that

11

she has difficulty sleeping at night because of her impairments and, as a result, she is tired throughout the day and naps approximately four hours a day, three times a week. (TR. 32). Because of her impairments, the plaintiff testified that she no longer engages in her hobbies of drawing, painting and writing poetry. The plaintiff does not go shopping for either groceries or clothing, but has others do that for her. She lives with her brother who performs most of the household chores. With her impairments, the plaintiff indicated that she can prepare light meals such as sandwiches, frozen foods and soup on a daily basis, which takes her about twenty minutes. She further indicated that she does light cleaning, such as dusting and small loads of laundry every two weeks. While performing these activities, she needs to rest intermittently. The plaintiff indicated that she can take care of her pets; she is able to go out on her own and drive a car occasionally; and she can manage her own finances.

Also testifying at the plaintiff's hearing before the ALJ was Sheryl Bustin, a vocational expert, who testified in response to a hypothetical posed by the ALJ that an individual of the plaintiff's age, education, work and experience, who could perform sedentary work activity with a sit/stand option and the inability to work in production, could perform representative occupations such as a table worker (quality control), a security system monitor, and a bench assembler, all of which existed in sufficient numbers in the national, state and local economies.

## V.   DISCUSSION

On appeal, the plaintiff argues that the ALJ did not properly assess her residual functional capacity, ("RFC"). (Doc. No. 10, pp. 6-10).

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96–8p, 61 Fed.Reg. 34475. A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

In determining a plaintiff's RFC, the ALJ must consider all relevant evidence, including the medical evidence of record and the plaintiff's subjective complaints. 20 C.F.R. §404.1545(a). At the hearing level, the responsibility for determining a plaintiff's residual functional capacity is reserved for the ALJ. 20 C.F.R. §404.1546. The final responsibility for determining the RFC is reserved for the Commissioner, who will not give any special significance to the source of another opinion on this issue. 20 C.F.R. §404.1527(e)(2), (3).

As to her RFC, the plaintiff initially argues that the ALJ erred in failing

13

to determine that her migraines were a severe impairment. The defendant counters that the ALJ recognized that the plaintiff's migraines were medically determinable, but found that they are managed with medication and therefore not severe.

An impairment is severe if it is "of magnitude sufficient to limit significantly the individual's ability to do basic work activities." Santise v. Schweiker, 676 F.2d 925, 927 (3d Cir. 1982); see also 20 C.F.R. §404.1520(c); S.S.R. 96–3p, "Considering Allegations of Pain and Other Symptoms in Determining Whether a Medically Determinable Impairment is Severe." Basic work activities are defined in the regulations as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §404.1521(b). A non-severe impairment is a "slight" abnormality which has a minimal effect on the individual such that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience. Bowen v. Yuckert, 482 U.S. 137, 149–51, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

In assessing the severity of an alleged impairment, the ALJ must consider "all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §404.1529(a). A claimant's burden at step two is not weighty. As the Third Circuit has stated, "[t]he step-two inquiry is a *de minimis* screening device to dispose of groundless

claims." Newell v. Commissioner of Social Security, 347 F.3d 541, 546–47 (3d Cir. 2003).

In this case, the plaintiff acknowledges having a long history of migraines prior to her alleged onset date and having worked during this time. (Doc. 10, p. 6). Further, the record reflects that, prior to her onset date, from July 2007 through November 2007, the plaintiff experienced significant improvement of her migraines while receiving chiropractic treatment. (TR. 256-77). The record further reflects, however, that beginning in August 2009, after the plaintiff's alleged onset date, Dr. May noted that the plaintiff's migraines were worsening and adjusted her medication. (TR. 305-06, 480-81). Dr. May later noted in November 2009 and March 2010 that the plaintiff's migraines were "failing to change as expected." (TR. 301-04, 483-84, 486-87).

Also in March 2010, the plaintiff's treating physician, Dr. Conway-Wiley, noted that the plaintiff was presenting with classic migraine symptoms that, in conjunction with medication, improved with sleep, dimmed lights and quiet surroundings. Despite her medication regimen, the plaintiff was noted to be experiencing three to four migraines per month. (TR. 357).

The plaintiff's migraines were noted by Dr. May to be "unchanged" in June and September of 2010. (TR. 435-36, 488-89, 491, 519-20). By January 2011, Dr. May noted "[increased] headaches at 2/week." (TR. 521). Further, he noted "None" with respect to Improvement for the category "Headache." (Id.).

15

The plaintiff testified at her hearing before the ALJ that she takes three different kinds of medication for her migraines. While the medications do help to control her migraines, in conjunction with the medications, the plaintiff testified that she is required to rest in a dark, quiet place and ice her head for several hours at a time each time she gets a migraine. As noted by Dr. May, the plaintiff testified that her headaches occur approximately two to three times per week.

The medical evidence of record establishes that, at the least, even with medication, the plaintiff suffers three to four migraines per month. Most proximate to the hearing, the medical evidence establishes that the plaintiff suffers as many as two to three migraines per week. Given the medical evidence of record, the court finds that the plaintiff has satisfied her *de minimus* burden at step two in showing that her migraine headaches are a severe impairment.

The plaintiff further argues on appeal that the ALJ's RFC assessment is not in accordance with SSR 96-8p because it does not include postural limitations and other limitations related to neck pain, shoulder pain, fatigue, and balance that are established by the evidence. Here, the plaintiff argues that the ALJ claimed his RFC assessment was supported by "the medical records, the opinion of Dr. Haag, and the opinion of the State agency medical consultant." (Doc. 10, pp. 9-10).

Upon review, without any substantive discussion, the ALJ referenced

the State agency physician's residual functional capacity assessment finding that the plaintiff was limited to lifting and carrying twenty pounds occasionally and ten pounds frequently, standing and walking for six hours in an eight hour workday and sitting for six hours in an eight hour workday. (TR. 39-46). The ALJ afforded "limited weight" to this opinion finding that the consultant "has not had the opportunity to evaluate the claimant, and, as such, has not had the opportunity to observe the functional limitations caused by the claimant's physical impairments." (TR. 17). Given this statement, it is hard to see how the ALJ could find that his RFC assessment was supported by the opinion of the State agency consultant.

Moreover, in reviewing, Dr. Haag's report, the ALJ relayed the following:

In January 2011, Jessica Haag, D.P.T. performed a consultative examination of the claimant (Exhibit 14F). Dr. Haag noted that the claimant has a standard handgrip of 30 with her right hand an 36 with her left hand, as well as a key pinch of 9 with her right hand and 8 with her left hand. Dr. Haag noted that the claimant demonstrated a score of 77% on the positional tolerance test which correlates with a rating of entry level. Dr. Haag further noted that the claimant had a score of 0% on the upper level reach test and the stooping reach test because of her refusal to complete the test. Dr. Haag noted that the clamant is capable of performing sedentary work. Dr. Haag observed that the claimant sits with her head positioned in moderate right lateral flexion and left rotation. Dr. Haag also observed that the claimant's gait is slow. However, Dr. Haag also noted that the claimant is able to perform narrow based stance with eyes open for 25 seconds, as well as with eyes closed for 11 seconds. Dr. Haag noted that the claimant is intact to light touch in her bilateral upper extremities. Dr. Haag opined that the claimant is limited to performing work at the sedentary exertional level, noting that the safety issues associated with her balance during walking and poor body mechanics may play a role in her ability to work. I give significant

weight to Dr. Haag's assessment, to the extent that it supports my finding that the claimant is limited to performing work at the sedentary exertional level. Dr. Haag's assessment is consistent with the clinical findings noted throughout the consultative examination, as well as the longitudinal medical treatment records.

(TR. 16).

Although the ALJ gave significant weight to Dr. Haag's report, he failed to discuss functional limitations cited by Dr. Haag. Specifically, Dr. Haag opined that the plaintiff could never squat, crouch, kneel, crawl or climb. Further, the ALJ apparently misinterpreted Dr. Haag's recommendations. To this extent, while the ALJ read Dr. Haag's report to suggest that the plaintiff was unconditionally capable of performing sedentary work activity, Dr. Haag actually stated:

Ms. Myer's demonstrated several safety concerns with body mechanics during lifting and with prolonged ambulation due to balance issues. She was unable to complete testing for positional tolerance with walking, stooping reach, upper level reach, and was rated "Entry Level" with axial rotation. She required the use of compensatory strategies including turning her entire body and shifting her weight to avoid cervical spine rotation during testing. She also demonstrated significant fatigue during testing, requiring rest breaks and developing early signs of a migraine headache. Ms. Myer's official physical demand classification according to her performance of 10 lb lifting activities **would be** Sedentary, **however**, the safety issues associated with her balance during walking and poor body mechanics may play a role in her ability to work at this time.

(TR. 516) (emphasis added).

Dr. Haag noted in her report that the plaintiff's effort was consistent throughout her evaluation and it was Dr. Haag's professional opinion that the

18

plaintiff's noted work tolerances (or lack thereof) were a true measure of the plaintiff's physical abilities. (TR. 516). Although affording Dr. Haag's opinion "significant" weight, the ALJ discussed none of the above functional or postural limitations which Dr. Haag found in assessing the plaintiff's RFC.

As for the medical records, they contain numerous references to neck pain, (TR. 143, 358, 361, 437, 472, 520, 521, 526), shoulder pain, (TR. 175, 180, 360, 361, 363-64, 521, 526), and issues with balance, (TR. 143, 194, 428, 432, 433, 520), none of which were considered by the ALJ in his RFC assessment.

In addition to deficiencies in the RFC assessment, the plaintiff argues that the ALJ erred in assessing her credibility because he did not apply the required factors; he stated reasons for finding the plaintiff not credible that are not supported by the evidence; and he failed to evaluate the effects of obesity on the plaintiff's ankle despite her surgeon's opinion that obesity played a role in her symptoms. Relatedly, in considering her subjective complaints, the plaintiff argues that the ALJ's pain analysis is not in accordance with correct legal standards and is not based on substantial evidence. (Doc. 10, pp. 16-19).

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.' Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir.1997); see also

*Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir.1991) ('We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.')." *Frazier v. Apfel*, 2000 WL 288246 (E.D. Pa. March 7, 2000).

When considering a plaintiff's subjective complaints of pain, the ALJ must engage in a two-step analysis. First, the ALJ must determine if the alleged disabling pain could reasonably result from the medically determinable impairment; and second, the ALJ must consider the intensity and persistence of the claimant's disabling pain, and the extent to which it affects his ability to work. See *Diaz v. Commissioner of Social Security*, 39 Fed. App'x 713, 714 (3d Cir. June 12, 2002).

"[A]n ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence." *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). Where in fact "medical evidence does support a claimant's complaints of pain, the complaints should then be given 'great weight' and may not be disregarded unless there exists contrary medical evidence." *Mason*, 994 F.2d at 1067–68 (citing *Carter v. Railroad Retirement Bd.*, 834 F.2d 62, 65 (3d Cir.1987); *Ferguson*, 765 F.2d at 37).

Here, after reviewing the medical evidence of record, the ALJ determined that the plaintiff's subjective complaints were not entirely credible. In part, the ALJ relied upon the conservative nature of the plaintiff's treatment.

Specifically, with respect to her torticollis, the ALJ noted that the plaintiff's treatment has been routine and conservative in nature consisting only of routine botox injections. The ALJ further provided that there are no records indicating that the plaintiff has attended physical therapy for her torticollis.

As argued by the plaintiff, however, there is an indication that the plaintiff attempted physical therapy for her torticollis. Prior to her alleged onset date, in February and March of 2007, the plaintiff did attend several sessions of physical therapy for her torticollis. While the plaintiff was initially noted to have improvement with physical therapy, she subsequently was noted to have inflamation with increased pain in her neck. As a result, the plaintiff's physician recommended that she not continue physical therapy. (TR. 242-47, 179). Thereafter, there is no indication in the record that any physician recommended that the plaintiff return to physical therapy for her torticollis.

In addition to attending physical therapy, the plaintiff also underwent chiropractic treatment for her torticollis from July 2007 through November 2007, which the ALJ failed to discuss. (TR. 251-78, 146).

Finally on this point, the plaintiff's neurologist, Dr. May, indicated that more aggressive treatment in the form of surgery was not a viable alternative to the botox treatments because there was a high risk that surgery would cause the plaintiff's head to tilt in other directions. (TR. 34).

Thus, although the ALJ discredited the plaintiff's testimony on the basis that she was receiving only conservative treatment for her condition, there is

no medical evidence in the record that there is any other treatment available to the plaintiff which has been recommended but which she has not tried[4].

As for the plaintiff's ankle fracture, the ALJ noted that the plaintiff had not received medical treatment relative to her fracture since September 2010. In addition, the ALJ indicated that, despite the plaintiff's complaints of swelling and decreased range of motion, Dr. Alhadeff noted upon examination that the plaintiff had appropriate range of motion.

The plaintiff argues here that, just two weeks before the hearing, Dr. Haag found that she had a limited range of motion in the left ankle and that she could stand on her left ankle for only two seconds[5]. Moreover, after her hearing, the plaintiff points out that Dr. Sicilia noted that she had very mild ankle swelling edema on the left compared to the right and that she had residual reduction ankle range of motion. While this is true, as noted by the ALJ, after the plaintiff underwent removal of the syndesmotic screw from her left ankle in September 2010, there is no evidence in the record that the plaintiff had complained of continuing pain or sought any further medical treatment for her ankle. In fact, Dr. Alhadeff noted after the surgery that the plaintiff reported doing well, that her pain had improved from her preoperative

---

[4]     In fact, as noted above, the Taber's Cyclopedic Medical Dictionary provides that botox is used to treat spasmodic torticollis.

[5]     Dr. Haag noted that the plaintiff could stand on her right ankle for three seconds.

level, and that her ankle felt more "normal." Upon examination, Dr. Alhadeff noted that the plaintiff had some swelling, but had good range of motion in her ankle. In addition, she was able to walk at that time with just a slight limp. The plaintiff was directed to continue with exercises to improve her range of motion and strength. Dr. Alhadeff indicated he would follow up as needed. No further treatment records from Dr. Alhadeff are contained in the record.

The plaintiff also argues in relation to her ankle injury that the ALJ erred in failing to factor obesity into his determination about the plaintiff's credibility as to the severity of her ankle symptoms. (Doc. 10, pp. 19-20).

While the plaintiff did not claim disability based upon her obesity, the ALJ did find that she had a history of obesity and that it was a severe impairment. (TR. 12). In Rutherford v. Barnhart, 399 F.3d 546 (3d Cir. 2005), the ALJ was on notice of the plaintiff's obesity, although the plaintiff did not specifically claim obesity as an impairment. The ALJ did not consider obesity in his decision and the plaintiff appealed. The Rutherford court held that remand was unnecessary because the outcome of the plaintiff's case would not be affected by the ALJ's consideration of the plaintiff's obesity. Id. at 553. In Rutherford, the court reasoned that the ALJ had implicitly considered the plaintiff's obesity by considering the medical evidence of record, including the plaintiff's physicians' findings regarding her limitations and impairments. Because the court found that the plaintiff's treating physicians would have been aware of the plaintiff's obvious obesity, the court found that the ALJ's

23

consideration of their conclusions was a satisfactory, if indirect, consideration of that condition.

Here, the plaintiff's primary treating physician, Dr. Conway-Wiley was obviously aware of the plaintiff's obesity, as it was noted in her treating records. Moreover, while Dr. Alhadeff noted prior to the removal of the syndesmotic screw that the plaintiff's weight may be causing her trouble, after Dr. Alhadeff removed the screw from the plaintiff's ankle, no further complaints of pain were noted. The ALJ considered these opinions in relation to his determination. By considering the medical evidence of record which factored in the plaintiff's obesity, the court finds that the ALJ implicitly considered that impairment. Therefore, the court finds that no further review of the plaintiff's ankle impairment or obesity is warranted.

In addition to the conservative nature of her treatment, the ALJ also relied in large part upon the plaintiff's activities of daily living in determining that she was not entirely credible. Here, the ALJ indicated that:

> The claimant participates in various activities of daily living. The claimant reported that she is able to do household chores, including light cleaning, washing dishes, doing laundry and caring for her cat. (Exhibit 17E). The claimant prepares meals daily. She watches television and reads for several hours per day. The claimant drives. An individual with the severe physical impairments alleged by the claimant would not likely be able to perform the aforementioned activities of daily living on a regular basis.

(TR. 17).

However, when looking at what the plaintiff actually reported as her

activities of daily living, it is clear that these activities do not reflect the plaintiff's ability to engage in substantial gainful work activity. The plaintiff did report that she does light dusting and small loads of laundry. The plaintiff indicated, however, that she does these about every two weeks and that she does these things only a little at a time, with periods of intermittent rest needed. She also did indicate that she prepares meals on a daily basis. However, she indicated that these meals involve heating up frozen foods or canned soup, or preparing a sandwich, which takes a total of twenty minutes per day. The plaintiff did indicate that she watches television occasionally and reads for approximately four hours at a time. She further indicated, however, that she must do so in a reclining position with her head propped up with a pillow; otherwise, she experiences pain after approximately fifteen minutes. The plaintiff did also testify that she can drive, but that she does not do so often, only going to her mother's house or the doctor's, because she cannot turn her head to the right and, instead, has to turn her entire body when driving.

As noted in Payton v. Shalala, 25 F.3d 684 (8th Cir. 1994),

a claimant need not prove that he or she is bedridden or completely helpless to be found disabled. In order to find that a claimant has the RFC to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which people work in the real world.

25 F.3d at 684 (internal quotations and citations omitted). See also Fell v.

Astrue, 2013 WL 6182041 (M.D. Pa. Nov. 25, 2013).

The court does not find the plaintiff's activities of daily living to be inconsistent with her subjective complaints of pain.

In light of all of the above, with the exception of the ALJ's finding with respect to the plaintiff's ankle impairment, the court finds that the ALJ's RFC assessment and credibility determinations are not supported by substantial evidence. On this basis, the plaintiff's appeal will be granted and the decision of the ALJ reversed with direction for payment of benefits.

## VI.   CONCLUSION

For the reasons stated above, the plaintiff's appeal from the decision of the Commissioner of Social Security, (Doc. 3), will be **GRANTED**; the decision of the Commissioner will be **REVERSED**; and the Commissioner will be directed to award the plaintiff benefits. An appropriate order shall issue.



s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date:  June 23, 2014**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2013 MEMORANDA\13-0162-01.wpd